*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A13-2094**

State of Minnesota,
Respondent,

vs.

Lukas Roy Miller,
Appellant.

**Filed December 29, 2014
Affirmed in part, reversed in part, and remanded
Rodenberg, Judge**

Roseau County District Court
File No. 68-CR-12-1096

Lori Swanson, Attorney General, John B. Galus, Assistant Attorney General, St. Paul, Minnesota; and

Karen M. Foss, Roseau County Attorney, Roseau, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Davi E. Axelson, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Rodenberg, Presiding Judge; Hooten, Judge; and Kirk, Judge.

**U N P U B L I S H E D   O P I N I O N**

**RODENBERG**, Judge

Appellant Lukas Roy Miller challenges his conviction for second-degree sale of a

controlled substance, arguing that (1) the substance the jury found him to have sold was

not a prohibited "hallucinogen" at the time of the sale; (2) evidence of threats to a witness by a third party was improperly admitted at appellant's trial; and (3) the prosecutor committed misconduct during the trial. We affirm in part, reverse in part, and remand to the district court.

**FACTS**

On August 3, 2012, Roseau police conducted a controlled-buy operation at appellant's residence with a then-confidential informant (CI), later identified as A.L. Again, on August 10, 2012, Roseau police conducted another controlled-buy operation at appellant's residence with a different CI.[1] During each controlled-buy operation, each CI obtained a substance later identified as 25I-NBOMe, a substance that witnesses would later testify is an analog to an hallucinogen, 2C-I.

A.L., the CI in the August 3 controlled-buy operation, was an acquaintance of appellant's. He testified at trial that he, appellant and Jesse Berggren, appellant's roommate, were at appellant's residence on August 2. A.L. testified that appellant and Berggren told him that they had "synthetic acid," that they gave him 10 tabs to "try out," and that he took one tab that night. He also testified that he told appellant and Berggren that his own father "used to be a hippie and he used to do these types of things," and that he could sell synthetic acid to his father and others in Grygla. A.L. also testified that he arranged with Berggren to purchase 100 tabs of the synthetic acid for $200. On August 3, A.L. went to the Roseau police station with the 10 tabs of 25I-NBOMe he allegedly

---

[1] Appellant was acquitted of charges from the controlled-buy operation on August 10, 2014. The facts related to that incident are not relevant to appellant's arguments on appeal.

received from Berggren and appellant, and offered to assist the police as a CI in purchasing more of the substance from appellant and Berggren.[2] A.L. testified that Berggren said he would not be at the residence on August 3, but that appellant would be there and A.L. "was to communicate with [appellant]."

In the afternoon of August 3, police conducted a controlled-buy operation in which A.L. allegedly purchased 100 tabs of synthetic acid from appellant at appellant's home. An audio recording of the operation was admitted at trial, but much of the conversation between appellant and A.L. was inaudible. A transcript was provided to the jury as the recording was played during trial. Appellant is transcribed as saying, concerning the substance delivered to A.L., "like some people, some people sell it as meth[,] but I just tell them what the f--k it is." A.L. left appellant's residence and turned over to police the 100 tabs of a substance later tested and found to be 25I-NBOMe.

Appellant was charged with second-degree sale of a controlled substance in violation of Minn. Stat. § 152.022, subd. 1(3) (2012), on August 3; conspiracy to commit a fourth-degree controlled substance crime (sale) in violation of Minn. Stat. § 152.024, subd. 1(1) (2012), on August 10; and sale of a noncontrolled substance represented as a controlled substance in violation of Minn. Stat. § 152.097, subd. 1(1) (2012), on August 3.

A.L. testified for the prosecution at trial, consistent with the foregoing. Appellant testified that he did not sell A.L. anything when A.L. visited his home on August 3.

---

[2] It is unclear from the record whether appellant claims to have received a total of 10 or 11 tabs of the substance on August 2.

Instead, he testified that A.L. "had some of that 25I stuff" on August 2 and that "he said he [sells it as acid] in Grygla." Appellant testified that, on August 3, A.L. walked into his home while appellant and his girlfriend were doing laundry and called appellant's name. A.L. began talking about what appellant believed was A.L.'s plan to sell drugs to people in Grygla. Appellant testified that, after some conversation, A.L. asked him if he had "anything to put that in," referring to a bag A.L. had in his hand containing "those same paper squares that he had" the night before. Appellant testified that he then shook his head to signal no and kept folding clothes while A.L. "started talking about the Grygla people again." Appellant testified that he told A.L. at that point, "I'd tell people what it is," meaning that he did not think it was right to represent the drug as one thing when it was something else.

During the three-day jury trial, the prosecutor asked Sergeant Jeff Klein of the Roseau Police Department, about threatening text messages allegedly received by A.L. from Jesse Berggren. The following questioning occurred without objection from appellant:

> Q: Okay. Were you ever contacted by Mr. [A.L.] after August 3rd, 2012 at all with any relation to this incident or Jesse Berggren? Was there any mention of that --
> A: Oh, yes. January 14th, 2013, [A.L.] came into my office, reported to me about some phone calls that he'd been receiving during the night . . . Jesse Berggren was trying to get ahold of him. [A.L.] -- Mr. A.L. indicated that he didn't want to talk to him. Mr. Berggren had left a phone message. I can't remember what that said. I don't have a copy of that or anything. But Mr. Berggren did send texts to Mr. [A.L.] in regards to this case.
> Q: But you don't know that but you would -- this was an allegation that was brought to you by Mr. [A.L.]?

4

A: Correct, yeah.
Q: What was the nature of the complaint?
A: Receiving threatening texts from Mr. Berggren.
Q: And what was the nature of why he was being threatened?
A: Threatened because he was a snitch because his boy is -- because this case is going to put him -- his boy away for --
Q: Don't talk about that.
A: Sorry.
Q: That's all right. But it was just a threatening message, is that correct?
A: That's how he took it, yep.
Q: Did you then follow up and investigate that matter?
A: Yes. I made numerous attempts over the next -- Mr. Berggren has been elusive. I followed up to talk to him into the month of January -- or February. And I haven't seen him since.

During closing arguments, the prosecutor referred to the "threatening text message" A.L. received to rebut the argument that A.L. never obtained the synthetic acid from appellant. At trial, the prosecutor also made several references to the "war on drugs" and its history and development over time. He described the "just say no" campaign under the Reagan administration, increased methamphetamine use in the 1990's, and changes in the law in response to that trend. He referenced "a new era" and a "new front" in the "war on drugs" involving synthetic drugs like the substance involved in this case. During his opening statement, the prosecutor stated:

Because the overarching public policy of our country, I believe, and I think the majority of the public opinion, at least as it survives today, remains consistent, and that's that illegal street drugs are dangerous. They're harmful. And, overall, if we're going to all live together in a society that's regulated by laws and rules, then we need to have laws and rules and regulations that put these drugs into check. . . .

I think a good example of this new front on this war on drugs, if anybody remembers in the 1990's, there was the battle of this methamphetamine use, and there were these people who would go into the pharmacies around the country and they would get the allergy medications and they would be able to extract a chemical out of the allergy medications that were sold over the counter and make methamphetamine. . . .

The evidence in this case will show again that we've kind of entered a new era. We're in a new war on drugs. And the fair characterization of what the evidence will be at this trial is about this new war on drugs.

Concerning the use of informants in drug-sale cases, the prosecutor also began his summation, stating:

I picked out a quote from a Brian Sallee, a police officer who's the president of Narcotics Enforcement Training and Consulting, a firm that instructs officers around the country in drug bust procedures. The quote from that article was essentially Mr. Sallee, the police officer, said, "Foot soldiers -- informants are the foot soldiers in the government's war on drugs. Without them, narcotics operations would practically cease to function."

And I guess, you know, that's what this case boils down to and that's what the State's position is here.

The prosecutor referred to the "war on drugs" nine times in his opening statement and three times in summation. He mentioned the new "front" five times in his opening statement.

Appellant's trial counsel rebutted the prosecutor's comments in his summation, arguing:

You know, the State's used the term "war on drugs" a few times, talking about the war on drugs, foot soldiers and the war on drugs. Now, I could probably go on for way too long about differing opinions on the war on drugs, but I think we

6

can agree that it's gone on for a long time, that it's constantly changing. What the State's proposing here is that this is a new front on the war on drugs. And maybe, when you're talking about what you term designer drugs, maybe that is a new front. I don't know. I'm neither smart enough or in tune enough to be making those types of decisions.

We're not talking about general public policy here in this courtroom today. That's a side show. We're not talking about the effectiveness of the war on drugs. That's a side show. What we're talking about today again is, simply, did Mr. Miller sell drugs? Did he do it? When you look at the evidence, if this is being framed as a new front on the war on drugs, then this has been a distraction.

The state dismissed the charge of sale of a noncontrolled substance before jury deliberations. The jury found appellant guilty of the sale on August 3 and not guilty of the sale on August 10. Appellant was sentenced to 90 months in prison. This appeal followed.

## D E C I S I O N

Appellant argues that (1) the plain and unambiguous language of the relevant statues did not criminalize the sale of the substance he was found to have sold on August 3; (2) the prosecutor's references to the "war on drugs" in his opening statement and in his summation were prosecutorial misconduct; and (3) testimony about the threats A.L. received were improperly admitted and prejudicial.

## I.

Appellant argues that the 2012 amendments to Minnesota Statute chapter 152 unambiguously fail to define 25I-NBOMe as an "hallucinogen" for purposes of the

charge under Minn. Stat. § 152.022, subd. 1 (3).[3] Respondent, for its part, candidly and commendably concedes that the 2012 statute contains errors amounting to what it characterizes as a "technical oversight" and a legislative "goof-up." But respondent argues that the legislature's intention can be discerned and that appellant's conviction for the August 3 sale should be affirmed in spite of what it labels as the statutory ambiguity.

Appellant was charged with violating Minn. Stat. § 152.022, subd. 1(3), by selling 50 or more dosage units of an hallucinogen on August 3, 2012. As of August 1, 2012, hallucinogen is effectively defined as "any hallucinogen listed in section 152.02, subdivision 2, clause (3), or Minnesota Rules, part 6800.4210, item C, except marijuana and Tetrahydrocannabinols." Minn. Stat. § 152.01, subd. 5a (2012).

"Statutory construction is a question of law and is reviewed de novo." *State v. Wukawitz*, 662 N.W.2d 517, 525 (Minn. 2003). "The primary objective in the interpretation of a statute is to ascertain and effectuate the intention of the legislature." *Id.* "If the statutory language is plain and unambiguous, the court does not engage in any further construction and instead looks to the plain meaning of the statutory language." *Id.* "A statute is only ambiguous if its language is subject to more than one reasonable interpretation." *Christianson v. Henke*, 831 N.W.2d 532, 537 (Minn. 2013).

Before August 1, 2012, possession or sale of analogs of hallucinogens were not prohibited by Minnesota law. *See* Minn. Stat. § 152.02, subd. 2(3) (2010) (defining hallucinogen as a "material, compound, mixture or preparation which contains any

---

[3] This issue was not raised before the district court, but the state makes no argument on appeal that the issue has been waived.

quantity of the following hallucinogenic substances, their salts, isomers and salts of isomers, unless specifically excepted" that contains an hallucinogenic substance); *see also* Minn. Stat. § 152.01, subd. 5a (2010) (defining hallucinogens as "any hallucinogen listed in section 152.02, subdivision 2, clause (3), or Minnesota Rules, part 6800.410, item C, except marijuana and Tetrahydrocannabinols").

In an apparent attempt to criminalize analogs of hallucinogens, the Minnesota legislature passed, and the governor signed, a revision to Minn. Stat. § 152.02, effective August 1, 2012. 2012 Minn. Laws ch. 240, § 1, at 764-87. "Hallucinogen" was defined as "any hallucinogen listed in section 152.02, subdivision 2, clause (3), or Minnesota Rules, part 6800.4210, item C, except marijuana and Tetrahydrocannabinols." Minn. Stat. § 152.01, subd. 5a. The legislature added a new subdivision captioned as "Hallucinogens." 2012 Minn. Laws ch. 240, § 1, at 767-68. This subdivision included analogs of 2C-I in the definition, but that new subdivision was numbered as section 152.02, subdivision 2(d), to which no reference is made by other parts of the statute.[4] *Id.* at 768.

---

[4] The 2012 law failed to make any change to Minn. Stat. § 152.01, subd. 5a. *See* 2012 Minn. Law ch. 240, § 1, at 764-87; *see also* Minn. Stat. § 152.01, subd. 5(a) (2012) (repeating reference to "section 152.02, subdivision 2, clause (3), or Minnesota Rules, part 6800.4210, item C" as the lists defining hallucinogens).

After the 2012 amendment, hallucinogens were described as a substance listed either in the Minnesota Rules or in "section 152.02, subdivision 2, clause (3)," a subdivision and clause not then existing. Minn. Stat. § 152.01, subd. 5a (2012).[5]

The charging statute, section 152.022, subdivision 1(3), as written, and as of August 3, 2012, is confusing and impossible to fully execute. To determine what substances are considered hallucinogens under subdivision 5a, there are two lists referenced. But only one list, the Minnesota Rules list, existed as of August 3, 2012. The Minnesota Rules list defines hallucinogens as "any material, compound, mixture, or preparation which contains any quantity" of the substances included in the list. Minn. R. 6800.4210, subp. C (2011). But 25I-NBOMe, the substance involved in this case, is not included on this list. *Id.* As discussed above, the other list, purportedly "in section 152.02, subdivision 2, clause (3)" did not then exist. *Id.*

While only one of the referenced lists exists in the statute as written, the statute is not ambiguous. It has only one reasonable meaning: the substances defined as hallucinogens are to be found where indicated by the statute. "When we conclude that a statute is unambiguous, our role is to enforce the language of the statute and not explore the spirit or purpose of the law." *Christianson*, 831 N.W.2d at 537 (quotation omitted). We must apply its plain meaning, refraining from further statutory construction. *State by Beaulieu v. RSJ, Inc.*, 552 N.W.2d 695, 701 (Minn. 1996); *see also Leifur v. Leifur*, 820

---

[5] In 2013, the legislature changed the reference in this subdivision to "paragraph (d)." 2013 Minn. Laws ch. 113, art. 3, § 1. The law also added 25I-NBOMe to the list of hallucinogens in Minn. Stat. § 152.02, subd. 2(d). 2013 Minn. Laws ch. 113, art. 3, § 2.

N.W.2d 40, 43 (Minn. App. 2012) (noting that "meritorious policy arguments" were rejected because we "may not disregard unambiguous statutory language").

When looking at section 152.02, subdivision 2, as it existed on August 3, 2012, there is no clause (3), as referenced in Minn. Stat. § 152.01, subd. 5a. There is, however, a paragraph (d) to subdivision 2, containing the list of substances defined as hallucinogens, and which includes analogs. *Id.*, subd. 2(d) (2012). It appears that the legislature intended, by the 2012 amendments, to criminalize analogs of hallucinogens. But it failed to do so. The legislature's evident drafting error does not permit us to abandon our well-established rules of statutory interpretation. Appellant argues, and we agree, that he cannot be punished for conduct that was not effectively defined as criminal. Under the plain language of the statute as it existed on August 3, 2012, appellant cannot be convicted of second-degree sale of an hallucinogen because the 25I-NBOMe was not then effectively defined by statute or rule as an hallucinogen. *See Bouie v. City of Columbia*, 378 U.S. 347, 350, 84 S. Ct. 1697, 1701 (1964) (stating that the state cannot punish conduct that was not criminal when committed).

In this unusual circumstance, the rules of criminal procedure require us to "(1) direct a new trial; (2) vacate the conviction and enter a judgment of acquittal; or (3) reduce the conviction to a lesser included offense or to an offense of lesser degree, as the case may require. If the court reduces the conviction, it must remand for resentencing." Minn. R. Crim. P. 28.02, subd. 12. Appellant concedes that the jury's verdict convicting him of count one necessarily includes the jury's conclusion that he committed a fourth-degree controlled substance sale in violation of Minn. Stat.

11

§ 152.024, subd. 1(1) (2012). Section 152.024, subdivision 1(1) defines sale of "schedule I, II, or III" substances as a crime. *Id.* These schedules are defined in section 152.02 and include hallucinogen "analogs," and specifically including analogs to 2C-I. 25I-NBOMe is an analog of 2C-I, according to expert testimony at trial. Minn. Stat. § 152.02, subd. 2(d). Because the jury's verdict necessarily encompasses a conclusion that appellant was guilty of a fourth-degree controlled substance sale, we "reduce the conviction to . . . an offense of lesser degree" and remand to the district court for resentencing. Minn. R. Crim. P. 28.02, subd. 12.

## II.

Appellant also argues that evidence about threats allegedly made by Berggren to A.L. was improperly admitted and that respondent committed prosecutorial misconduct by repeatedly framing the case as the "new front" in the "war on drugs." Appellant did not object to these claimed errors at trial.

We review the admission of unobjected-to testimony under the plain-error standard, requiring the appellant to show (1) error; (2) that was plain; and (3) that affected appellant's substantial rights. *State v. Griller*, 583 N.W.2d 736, 740 (Minn. 1998). If all three prongs are met, we determine "whether [we] should address the error to ensure fairness and the integrity of the judicial proceedings." *Id.*

When a defendant fails to object to prosecutorial misconduct at trial, we review under a modified plain-error standard. *State v. Ramey*, 721 N.W.2d 294, 302 (Minn. 2006). This two-tiered test first requires appellant to establish that the prosecution committed error that is plain in that the prosecutor's conduct contravenes caselaw, a rule,

12

or a standard of conduct. *Id.* If appellant makes this showing, the burden shifts to the state to demonstrate that the misconduct did not affect appellant's substantial rights. *Id.* Even where misconduct occurs, we reverse only when an appellant was denied a fair trial. *State v. Porter*, 526 N.W.2d 359, 365 (Minn. 1995).

Even if the district court's admission of testimony regarding the threats to A.L. and the prosecutor's references to the "war on drugs" were plain error, which we do not decide, the testimony and references did not affect appellant's substantial rights. In so concluding, we consider "the strength of the evidence against the defendant, the pervasiveness of the improper suggestions, and whether the defendant had an opportunity to (or made efforts to) rebut the improper suggestions." *State v. Hohenwald*, 815 N.W.2d 823, 835 (Minn. 2012) (quotation omitted). Here, A.L. testified that appellant sold him 25I-NBOMe, and appellant admitted he was the person on the audio recording of the controlled buy. The jury found appellant guilty of one count and not guilty of the second count arising from a separate incident. This is a strong indication that the jury analyzed each count separately and made decisions based on the evidence presented. If the jury had been improperly influenced by the testimony of the threatening text messages or the prosecutor's references to the "war on drugs," it surely would have found appellant guilty of both counts. And while the prosecutor repeatedly referred to the "war on drugs" in his opening statement and his summation, appellant had an opportunity to rebut the prosecutor's comments, and did so effectively. Appellant's counsel obviously adopted a defense strategy on using the prosecutor's references to the "war on drugs" to indicate the weaknesses of the state's case. And the jury did acquit appellant of one count.

13

We also observe that the district court intervened of its own initiative at one point during the trial, instructing both of counsel, outside the jury's presence, to stop referring to other cases and incidents of death caused by 25I-NBOMe. The district court's admonition appears to us to have greatly reduced or eliminated further improper references.

Finally, the district court properly instructed the jury, including instructions to "put aside any sympathy, prejudice or bias for or against either party in this case. Sympathy, prejudice and bias lead to unfairness, and you must be absolutely fair." And we must assume in the absence of some contrary indication in the record that the jury followed the instructions given it. *State v. Ferguson*, 581 N.W.2d 824, 833 (Minn. 1998).

Given the evidence in the record, the mixed verdict of the jury, the proper jury instructions, and the district court's appropriate admonition to counsel, together with appellant's effective rebuttal concerning the claims about the role of the "war on drugs," we conclude that appellant's substantial rights were not affected by the admission of the testimony regarding threatening text messages or by the prosecutor's references to the "war on drugs." That evidence and argument, even if plainly erroneous, did not affect appellant's substantial rights.

In sum, we conclude that appellant's conviction for second-degree controlled substance sale of an hallucinogen must be reduced to a conviction for fourth-degree controlled substance sale, and we reverse and remand for resentencing. We also conclude that any plain error in admitting testimony regarding threats to A.L. or

14

references by the prosecutor to the "war on drugs" did not affect appellant's substantial rights.

**Affirmed in part, reversed in part, and remanded.**